Mr. Sasse. Good morning. Good morning. May it please the Court, Ben Sasse for Appellants to Certain Underwriters at Lloyd's. This Carmack Amendment Appeal asks whether four bills of lading issued for locomotives that derailed established a written agreement limiting between the shipper and the carriers that limited liability. Mr. Sasse, can I can I ask you a question? Is it your position that the only written agreement in the case is the Bill of Lading? Correct, Your Honor. And nowhere in the Bill of Lading does there include a limitation of liability? That's exactly right, Your Honor. So how did this case get beyond that? It got beyond that. In page 22 of the District Court's Opinion on Summary Judgment, pages 22 through 24, I think, 23 through 25 of the appendix, the District Court looked at this code. It's called the Standard Transportation Commodity Code, excuse me, in the lower left corner of the Bills of Lading. The code is 3741110. And the Court said that that code was like a specific class designation. Now, the specific class designation was a reference to another case. The District Court cited Hughes Aircraft, but that's a mistake. That's a Ninth Circuit case that actually dealt with a written agreement that had a specific liability limit. What the District Court meant to cite was Siren, which is a case out of the Eleventh Circuit. Now, the Standard Transformation Commodity Code in the Bill of Lading is not at all like what was at issue in Siren. As you may recall, Siren involved a class designation, Class Designation 85. And the Eleventh Circuit took pains to stress that it was deciding on the record there. And what that record established was that class designation, Class 85, meant universally within the trucking industry that liability was limited to a rate of $11.87 per pound. Mr. Sasse, so I take it that you are... I just want to make sure what your position is and is not. So, it is not your position, I take it, that the limitation of liability has to actually, specifically, and expressly be in the Bill of Lading, right? That like that the $10,000 per unit or the $25,000 per unit, it's not your... Because certainly, that's not what you say in your reply. In your reply, you said Bill of Lading would need to incorporate the price list for that rate to apply. And ABB states that, you know, that they would have held in CS's favor if the price list 4605 had been referenced in the Bill of Lading. That's right. So, it can't... So, okay. So, we don't have to have the actual limitation of liability in the Bill of Lading, right? Right. Okay. So, then the question is, well, then what do we need? And it appears to me that at least from the way the ABB court looks at it and from your reply, that at a minimum, you need a reference to the specific price list. Correct. Right? So, whether it's the 6051 or the, you know, the public price list that the other railway has. And so, I guess my question then is, if the record can establish that the reference to the locomotive category basically incorporates... So, if you... For CSX, if you put that locomotive category in, you know, it brings up public price list CXXT6051. And then for the other railroad, forgive me, I just go by acronyms, so that's not very helpful. You know, that designation would automatically bring up EVWRQ5012. So, your argument is that if EVWRQ512 was in the Bill of Lading, everything would be hunky-dory. But yet, you're saying that STCC3741110 is not sufficient, even though between these parties, what that denotes is the actual price list for Evans Western Railroad and CSX. So, I'm just trying to figure out what's the difference between these parties, between referencing the price list versus the category, which will automatically lead both parties to the price list. So, I don't think between the parties that that denotes the price list. I guess the first place to start there is if you look at Supplemental Appendix page 30, where CSXT6051, that's their price list. And it says, for that price list to apply, and this is what CSX said, this is not what I'm saying, you have to put subject to CSXT6051 in the price list. Right. But then, Mr. Smith says that when, you know, before he entered all the information in the Bill of Lading, he got this price summary from CXS, right? And the price summary from CXS not only lists the locomotive designation, but it specifically lists CSX6051, list number two. So, the, is your position then that we have to, we're limited to the four corners of the Bill of Lading and we can't take any of these other documents that parties have been exchanging or that the parties viewed as part of our contract. You know, we actually interpret contracts and look at contracts and figure out what the parties meant by contracts. So, now I think I have four points. I'm going to try to get to them all. And I'll start where you ended, which is, common law contract principles cannot be used to overcome the absence of a written agreement. And I'd cite the Rerner-Gerig case for that, in addition to the ABB case. In other words, common law principles cannot trump the language of the CARMAC amendment. Exactly, Your Honor. Yes, thank you. And then, second in order, if you're getting down to- But can we use common law principles to determine whether or not there is a written agreement within the meaning of the CARMAC amendment? Well, in other words, the, you know, the, I, you know, completely agreed that we have to look at the CARMAC amendment first. But, you know, there's that old 1922 Supreme Court case, Chicago and Northwestern Railway that says, when you look at the CARMAC agreement, you know, you look at the bill of leading, and that depends on the acts of Congress, agreements between the parties and common law principles accepted and enforced in the federal courts. And so, I agree that we, common law principles might not, will not be able to trump the CARMAC amendment. But to try to figure out whether or not the parties complied with the CARMAC amendment, to figure out what the parties meant by the common law have interpreted contracts and agreements to figure out the intent and understanding of the parties as it's written. Well, I don't think you can look at course of dealing, which is really what they're relying on here. And I guess I'm not, we're not looking at course of dealing. I guess, okay, I agree with that. I guess my question is, what about the communications that took place between the parties related to this particular shipment? So, there were, there is nothing in the record, respectfully, on communications pre-shipment that could inform the meaning of the contract. I do want to get to quickly, and I know I'm interrupting your... Well, go ahead. We'll give you enough time. We have questions, so. Okay, thank you. I do need, I do want to get back quickly to this Exhibit 560, the price summary that you referenced. There is no testimony, respectfully, that this, that document was generated pre-shipment. If you look at the document Excel, on the lower right-hand corner, there's September 21, 2018, right? And we know that's five days after the derailment. And what they want to say is, well, that's just when it's printed. But that's not true. You've got to look at the document as a whole. Look at the left-hand side of that same column, and you'll see that the miles and the fuel charges were available as of September 21, 2018. Now, go up a little bit, and you'll see that there's also a line on that document, Your Honor, that talks about whether it was prepaid or collect. And it says either. So, what does that mean? What it means is it's just a generic document with terms and conditions. Now, why does that matter? Did J. Smith testify otherwise? Didn't he say he saw this electronically? No, Your Honor. He said the rate just popped up on the screen, and you had to click on a different screen to see terms and conditions. And so, where I was going with that is, if you look at the top of 560, that's the document, and that's the one document that contains the price list. You'll see that what was forwarded, what that is, is terms and conditions. That's what J. Smith forwarded, and he was asked to go in on September 21, because the question was, are there terms and conditions? And I'm not arguing that you can't find terms and conditions somewhere on the website. I'm saying there's no evidence that he looked for those terms and conditions before the shipment. I'm also saying, by the way, that all this stuff is part of price list CSXT 6051, right? Because what we're talking about now is part of the workbook. The workbook is part of the price list. How do you make the price list under their own offer, how do you make the price list part of the bill of lading? You put subject to 6051 in the bill of lading itself, and that didn't happen. Are you disputing that the parties, putting aside a written agreement, that the parties intended to limit liability here? I'm not disputing that. I'm saying they don't, I'm saying the current amendment. That's what I struggle with a bit. Looking at all the evidence here, it seems like all the parties to this agreement intended to limit liability. It's consistent with what they paid for shipping, it's consistent with their course of dealing, that they intended to limit liability here and thought that they were limiting liability. How is it that you can now come in in a subrogation role trying to get more? It just seems, that seems wrong. Yeah, I appreciate the question. I guess what I would say is that you're going a little bit farther than I would. I would say the parties intended to pay for a specific rate, and based on their course of dealing, National Railway understood that that rate came with terms and conditions. Including limitation of liability. I mean, I think, sure, there's a limitation of liability. It's not that clear to me, quite frankly, whether they focused on the limitation of liability, per se. What they were aware of is what CSX's public rate was. They knew that rate came with terms and conditions, and they knew, by signing up with CSX, that they would be signing up for those terms and conditions. I guess what I'd tell you is there are three circuits that have said this kind of course of dealing evidence. The First Circuit in Kamaracourt, the Second Circuit in Gordon H. Mooney, Fourth Circuit in ABB. They all say this kind of course of dealing evidence is insufficient. If that makes you uncomfortable, I guess what I'd say is this statute has a structure. C1 says no limits of liability whatsoever. Narrow carve out to that unless you have it to a value established by written agreement. That's what the statute says. At the end of the day, what we're doing here is we're upholding the statute. The statute isn't necessarily made for my client. It's not necessarily made for National Railway. It serves a function across the board to require carriers to put these limits of liability in writing. We can't make these ad hoc exceptions just because we're a little bit uncomfortable about these facts, or you open up a can of worms, as the ABB court pointed out in its decision. Those cases that you cited, ABB and whatnot, I mean, there wasn't a lot of discussion about as I recall, and correct me if I'm wrong, is that there wasn't any notations from which a court can glean whether or not the value was established, the limit to a value was established by written agreement. That's why the ABB court said that, well, if they'd noted a price list, that would have been enough. Here, we have that CSST, the locomotive designation. So, doesn't that take this case and distinguish this case a bit from ABB and those other cases that said where there wasn't anything on the bill of lading, and certainly in that case, the course of conduct is not enough because that would be in violation of the Carmack Amendment. But here, if it's a matter of trying to figure out what the parties meant by that locomotive designation, doesn't that distinguish this from the other cases? No, Your Honor, because the other case, Sarin was the one that held that the class designation was enough, and there, the class designation, as the 11th Circuit took pains to point out, when you put right class 85 in the trucking industry on that record, that meant that you were limiting liability to $11.87 per pound. That's in the opinion. Here, what you have is undisputed testimony that if you write STCC code 3741110, the answer is it depends. It depends on what the price is. There are concessions. All witnesses agreed. That code does not carry with it a particular limit of liability. The same code would be in, Your Honor, the exact same code if it was a full rate under the Carmack Amendment. And so, that code in the bill of lading says absolutely nothing about what the rate limiting liability is. All it does is describe the product ship. And of course, the price lists describe the product ship. They have to describe the product ship to be a price list. But just by putting in the product ship into the bill of lading, that is not a clear and unambiguous acceptance of any associated terms and conditions, let alone a liability limit that may be in that price list. So, from your standpoint, given that the statute says a written agreement, regardless of what the parties intended, regardless of what the parties thought they had agreed to, regardless of what they orally agreed to, it really doesn't matter as long as it's not in writing. As long as it's not in writing, correct. Because otherwise, we would be implying limitations of liability, which cases across the circuits have said you cannot imply limitations of liability. That's exactly right, Your Honor. Go ahead. Can I ask one more question? So, when CTCC 374-1110 triggers a price list, right, and I'm looking at the Evansville Western Railroad 512 Revision 11, there's some prices on there. And then there's a note, carrier's maximum liability for lading is $25,000 per unit. What is being quoted there, is that the default pricing? That is, this is the lowest liability, you know, and so this is the pricing that you start with. And if you want additional coverage, you need to do other things. And if you do other things, then it's going to increase the price from that quoted on that document. Is that how it works? I'm just trying to understand. So I think there's a difference, Your Honor, between the two carriers at that point when we get that granular. As I understand it, there was testimony in the summary judgment record that Evansville Railway had at one point in time negotiated a separate price list with National Railway directly. And so the shipper and the carrier had at one point in time agreed to the price list. And then I think the price increased, the carrier increased the price over time in subsequent iterations of the shipping list. Separate from that, as to CSX, CSX just has a take it or leave it list that it puts on its website. And if you go down, it's not, it doesn't pop up when you get the rate, but my understanding is if you go through their website, you can get to a screen where you'll see an ability to call, it's not clear exactly who you call, but call somebody to try to get a different price. But the price that they give you on the website before you call, that price that I will, I'll call the default price, that price is based upon the lowest level of liability that CSX would. Yeah, that's right. And then of course, you know, this goes to the other argument that I don't want to belabor us here about whether or not they, CSX offered two or more prices, but yes, they just have that one right price on the list. Thank you. Thank you. Mr. Wolfe. Good morning and may it please the court. Dan Wolfe for Appalachian Evansville Western Interpretation. I have thrown out my prepared remarks. There's a lot to jump into. And so I'd like to make three main points addressing each questions posed by each of you, your honors, and then get into the issues raised by my friend for appellants. So there's two ways that this court should affirm or could affirm the decisions below, both for summary judgment for Evansville Western and the jury verdict for CSX. First, as judge Lee, as you articulated in some of your questions, CARMAP is fully satisfied by the written agreement here, which is the bill of lading, which makes reference to the governing price authorities through the stick code. I will circle back to that. The second way that this court could affirm is for the reasons you've articulated, Judge St. Eve, is that the parties completely agree. There is no daylight between the parties to that written agreement as to its meaning, which takes me, Judge Kirsch, to some of the questions. That would be a weird way to affirm, to say we should ignore the CARMAP amendment because the parties agreed to do something different than what the CARMAP amendment requires. Well, actually, I would respectfully offer that that's what makes this an easy case, because there's no other decision that they've cited or that we have found where the parties to the written agreement are in mutual accord and understanding, and the courts have said, nonetheless, that we're going to turn this over. And the point I was going to make in response to the question that you posed is there's no inconsistency here between common law principles of contract interpretation and the CARMAP amendment. The CARMAP amendment requires a written agreement, but the question is still what is that written agreement and what does it mean? And I think that there's a false dichotomy to say that you can't rely on common law principles of contract interpretation to find that CARMAP is met consistent with the testimony, frankly, of all the relevant parties. Now jumping into the issues, the first point I want to raise is just, frankly, a correction to a glaring mischaracterization that my friend made. He said that there's no evidence in the record that National Railway Equipment had the limitation of liability language prior to the move. That's just not true, and they've already conceded this point. In Record 400, which is their renewed motion for judgment as a matter of law, they say on page 2, footnote 1, plaintiffs acknowledge that NRA appears to have conceded that it was aware of CSX's limitation before the shipment commenced. And that's important because their own witness, Cindy Garbrecht, testified at trial that this is the questioning. Fair to say, Ms. Garbrecht, that if it were relevant, it would mean a much lower recovery for Lloyds. If it had been placed on the 16th, yes. So if it, and the it here is the limitation of liability language that J. Smith forwarded, or that NRA forwarded to Lloyds as part of its adjustment process, so if it was in place on the 16th, you would agree that it was a valid limitation of liability. And she responded, if it was valid on the 16th, correct. And J. Smith testified at least a half dozen times. At least a half dozen times, and probably more if you go back. Isn't that a matter of law, though? I'm not sure why there was a trial here, to tell you the truth. I mean, I can't figure that out. And you may not be able to figure that out either. But isn't that just a question on a matter of law as to whether or not there was a limitation of liability? That's for the judge to decide, not for a lay witness or a percipient witness. Well, whether there was a limitation, yes, that's a question of law, I agree. To your question, your underlying question about why there was a trial, let's just talk about that. They asked for the jury trial, not my clients. Now, they did not, and this is super important, they are now arguing there shouldn't have been a trial. They never moved for summary judgment on liability. They moved for summary judgment only partially on their prima facie case. It was only after Judge McGlynn below granting summary judgment in Evansville but going forward to trial to, in his words, to see if CSX perfected its own limitation, it's only after we went to trial and were seated with the jury that they raised for the first time in their motion for judgment as a matter of law, hey, we shouldn't even be in this courtroom. So the position changed, and that's an important point. Mr. Wolfe, what is the written agreement here from your perspective, and does it differ for the two clients? No. The written agreement is the, so you start with the bill of lading. That is the written agreement, and I really want to pick up on Judge Lee's line of questions because I think this tracks completely with ABB and with the siren case that they cite from the 11th Circuit. The testimony here is that the stick codes, first of all, let me just point out, the one thing they don't mention is if it's not the price authority from Evansville, 5012Q, revision 11, or if it's not CSXT 6051, what's the price? There has to be a price. Good people though they are, railroads don't ship cargo for free. There has to be a price, and so the folks in the industry know how to find that price, and so to your question, Judge St. Eve, the reason why the bill of lading satisfies the written agreement prong of CARMAC is because it makes that reference. It has the stick code, and that is a specific signal that you go off campus to somewhere else, no different than if it listed a price authority as the ABB court endorsed, no different than if it none of the courts, no decision says there's a four corners rule here, that everything has to be embodied in the bill of lading. It's just not a requirement of CARMAC, and it's not how CARMAC has been interpreted by the courts. So Mr. Wolf, you would agree though with what Judge Kirsch was saying, that if there was no stick code here, if there was nothing from which, if all we had was course of dealing and there was nothing from which we could divine from the bill of lading that the parties had agreed to a limitation of liability, that would not comply with the CARMAC amendment. Isn't that right? I would say that if the question is do we live in a world that was similar to the facts as described by the Fourth Circuit in the ABB case, at least the majority opinion, where you have no indication of price authority on the face of the bill of lading, and you have, importantly, testimony that the shipper was ignorant of what that price authority was, and in that case— Well, I mean, it seems to me that Judge St. Eve and Judge Kirsch are right in that if all we had was the testimony of the parties, I don't think that that would comply with the CARMAC amendment, because the limitation of the value has to be, in the words of the So there has to be something in the written agreement, right? I absolutely agree, and I want to make it completely plain as day, because they've accused us of running from the CARMAC amendment. Written agreement is 11706C3. It's there. And your argument is that the written agreement doesn't have to specify the actual limitation of liability. And, in fact, the provision itself just says limited to a value established by the written agreement. It doesn't say stated in or evidenced by, right? It just says established by, whatever that might mean. I absolutely agree, and I don't think that this Court needs to read into CARMAC words that Congress didn't put there. Established by what we do know and what's not in dispute, both Evansville and CSX published. They've established rates. They are available on their respective web portals that the Jay Smiths of the world, the shippers of the world, can access through their logins. They've established those rates exactly as allowed by 11706C3. And then they come with, they carry with them, limitations of liability. And all you need is a bill of lading or another written agreement. In fact, I'll point out ABB, which they rely on to a fairly well, doesn't even require a price authority. It said, and this is at page 143 of that decision, price authority or any other indication that the carrier limited its liability. We have that in spades here. And so I don't think that we can ignore the testimony of the industry participants here, both CSX and National Railway Equipment, to, you know, sort of blank reality about how these shipping agreements work. How do we get there on Evansville, though, if we don't have the testimony? Well, actually, we do have the testimony in the 30B6 record. Now, Judge McGlynn didn't rely on that testimony. But it's in the record and this court can rely on it. But you can also go, again, this goes to the two ways you can confirm or affirm, is either take Judge McGlynn's reasoning itself, which sort of tracks ABB and SIREN, or Judge St. Eve to just look beyond what Judge McGlynn considered, but look to what we actually had in the summary judgment record, which was 30B6 testimony, corporate representative testimony, from both the guy in charge, the director of shipping, and the general counsel said, every time we ship with these folks, we accept their limitations, or we accept their terms and conditions. If there's no other questions, I'll sit down. Thank you. Okay. Thank you. Mr. Sasse, we'll give you another minute. I mean, we seem to be vacillating between the testimony and the documents. But I guess what I would close with is, when you look at the bills of lading, all you see is the Standard Transportation Commodity Code. The only court I'm aware of that has ever said that reference to a code alone is sufficient to limit liability is the 11th Circuit and SIREN. They did that because that code itself carried a specific liability limit. Here, there is undisputed testimony that this code does not carry with it a liability limit. Rather, you have to look to another source to find that limit. So let me ask you, if I could ask you a hypothetical, right? So let's say there's a bill of lading, and it doesn't have an express limitation of liability. Instead, it has the word, birthday cake. Okay? And there's lots of testimony from the parties that what birthday cake means, right, because he talked about it before the bill of lading went out, they have e-mails exchanging this, that what birthday cake means is that the carrier will limit its liability to $10,000 per unit. Okay? But looking at the bill of lading, we can't figure out whether or not, other than the word birthday cake, what it means or whether or not the bill of lading limits the liability. In your mind, under that fact scenario, would that bill of lading satisfy the Carmack Amendment? You have an e-mail exchange saying beforehand. Yes. Saying that birthday cake means this. Yes. I mean, I think in that context, it would be a much harder argument for me to make. I guess my question is, well, but my question is, I guess it's, you know, in your framework of how the Carmack Amendment works, would that fact scenario comply? I think it's a close call. I think I could get up here and make an argument. I think I'd probably lose it. I think the difference between your hypothetical, though, and what I'm talking about is, here we have a bunch of testimony, and this goes to Judge Kirsch's point about why was there even a trial here. We have a bunch of testimony about state of mind, right? What we don't see, and if we want to play in a common law world, we have to play in it fairly. And to do that fairly, we have to look at objective manifestations of incent. And as you know, those are all things that predate the actual bill of lading. You don't get to come in here in a trial however many years later and say, well, gee, I thought to myself this carried with it this or that liability limit. And so the difference, really, going back to your hypothetical, Your Honor, is there you have the one thing you don't have here, which is some sort of e-mail exchange saying, hey, look, we're on the same page here. This code means it carries with it a liability limit. That's nowhere. That's something that got made up when this case came up on appeal. All you have is testimony saying that- given the record that the parties had, that understanding going- I mean, that was one of the issues for the jury trial, right? Well, I mean, we can have a debate about whether there should have been a jury trial, but I don't recall that the jury trial went to whether there's- the jury answered whether there's a written agreement. Sure. I don't think that was an issue for the jury to take and for the jury to answer. And I guess my point is there is no pre-bill of lading evidence on this point in the record. And so if the jury reached that conclusion based on state-of-mind evidence that post-dated the deal, that was just an insufficient and inadequate basis to have a jury verdict. Okay. Thank you. And so for these reasons, we respectfully request you reverse, Your Honor. Thank you. Thank you very much. Thanks to both sides. The Court will take the case under advisement.